517 So.2d 242 (1987)
Marty SIEMANN
v.
Rodney E. TESTON, et al.
No. 86 CA 1427.
Court of Appeal of Louisiana, First Circuit.
November 10, 1987.
*243 Ralph Fletcher, & Steve Marks, Marks and Lear, Baton Rouge, for Marty Siemann, plaintiff-appellee.
Keith Riddle, Richard Nevils (co-counsel), Baton Rouge, for Rodeny Teston & Southeastern Fidelity Ins. Co., defendants.
Horace Lane, Lane, Fertitta, Lane & Tullos, Baton Rouge, for State Farm Mut., State Farm Mut. Auto. Ins. Co.
Before WATKINS, CARTER and CHIASSON[*], JJ.
WATKINS, Judge.
Marty Siemann, plaintiff, filed a wrongful death and survival action against Rodney Teston for the death of her sixteen year old daughter, Peggy Barrett, who was killed on November 23, 1982, in an automobile wreck on Louisiana Highway 42 in Ascension Parish, Louisiana. Other defendants were Teston's automobile liability insurer, Southeastern Fidelity Insurance Company (Southeastern), and State Farm Mutual Automobile Insurance Company (State Farm), which provided uninsured motorist insurance covering Peggy Barrett.
A jury trial was held on April 11, 1986, and the jury returned a verdict finding that Rodney Teston was the driver of the vehicle at the time of the wreck in which Peggy Barrett was killed and that the death of Peggy Barrett was in fact caused by the conduct of Rodney Teston. The jury assessed damages in the amount of $250,000.00 for Marty Siemann's loss of love and affection, society, and grief, and $25,000.00 for the pain and suffering of Peggy Barrett prior to her death. Judgment was rendered in accordance with the *244 verdict of the jury against Teston, Southeastern and State Farm.
After the jury verdict, State Farm tendered its uninsured motorist policy limits, plus payment for funeral expenses under the medical payments coverage, plus judicial interest on both sums from the time of judicial demand, plus court costs. State Farm was released and is not a party to this appeal.
Southeastern deposited $6,510.00, representing its $5,000 policy limits together with legal interest, in the registry of the Ascension Parish Clerk of Court, and appealed devolutively the jury's decision. Teston also appealed devolutively.
The appellants raise the following assignments of error on appeal:
I. The jury verdict finding that defendant Rodney Teston was driving the vehicle at the time of the accident was clearly wrong and contrary to the great weight of the evidence.
(A) The judge erred in admitting accident reconstruction testimony from officers Constantino and Wisner, who were not qualified as expert witnesses in the field of accident reconstruction.
II. The jury erred in failing to find that Peggy Barrett contributed to her own injury by riding in an automobile with a driver who she knew or should have known was intoxicated.
III. The jury erred in failing to follow the law by awarding damages for conscious pain and suffering of the decedent when no such damages were proven.
IV. The award of damages for loss of love and affection, society, grief and mental anguish to Marty Siemann was excessive.
V. The judge erred in failing to allow defense counsel to question Teston as to the availability of alcohol to the plaintiff's decedent at her home prior to the plaintiff's decedent meeting the defendant Teston.
The established facts are that on the afternoon of November 23, 1982, defendant Rodney Teston and his first cousin, Kenneth White, went to Peggy Barrett's house in Baton Rouge to pick her up and go riding. After leaving Peggy's house, Teston drove about five or six blocks and stopped at a 7-11 Store on Stevendale Drive. Teston and White purchased alcoholic beverages and, thereafter, drove to Teston's house in St. Gabriel, Louisiana, where he got into an argument with his stepfather. Teston testified that thereafter he drove to where his mother worked some nine to ten miles away, and then returned to his home where he visited with a neighbor, Norbert Loupe.
Mr. Loupe testified that Teston, Barrett and White visited with him for approximately five to ten minutes, in his front yard, and that upon arriving and leaving Peggy Barrett was driving the Teston vehicle. Mr. Loupe approximated the time they left to be 6:30 p.m. He remembers the vehicle returning to Rodney Teston's house, which was visible from his front yard, for approximately ten to twenty minutes, and then leaving with Peggy Barrett driving the vehicle. He never saw the young people again that evening.
Rodney Teston testified that after leaving his home, it was their intention to go to his uncle's house to pay him for automobile repairs which were done for Teston. According to the record they never reached the uncle's home. Teston testified that Peggy Barrett was driving, and that after passing Triangle D he fell asleep, and did not remember the accident, his first recollection being some three days after the accident.
The one car accident occurred at 9:45 p.m. and Peggy Barrett died approximately five to ten minutes later as a result of her injuries. Both Rodney Teston and Kenneth White were also injured. Teston was taken to Our Lady of the Lake Hospital in Baton Rouge, and White was taken to the East Ascension General Hospital in Gonzales, Louisiana. Blood alcohol tests were administered by Louisiana State Police to Rodney Teston and Peggy Barrett, with readings of .14 and .11, respectively.
The accident was investigated by Trooper Keith Constantino and Sergeant Terry *245 Wisner of the Louisiana State Police, who arrived twenty to thirty minutes after the accident occurred. The officers noted that the accident occurred on Louisiana Highway 42, approximately 9 of a mile east of Louisiana Highway 44. Upon arriving at the scene the officers determined that the automobile and all passengers had been moved. The officers were unable to speak to any of the passengers, however before leaving the scene they took pertinent measurements, photographs, and interviewed bystanders, including Billy Eugene Campbell, who had arrived on the scene within minutes of the accident.
Officer Constantino testified that he and officer Wisner continued their investigation at the East Ascension General Hospital, where they learned of the death of Peggy Barrett, and spoke with Kenneth White concerning the accident.
After speaking with Kenneth White the officers proceeded to Our Lady of the Lake Hospital in Baton Rouge, where they administered Miranda rights to Rodney Teston before he admitted that he had been driving the vehicle at the time of the accident. Rodney Teston was not aware of Peggy Barrett's death at the time he made this admission. In their accident report the officers stated that Teston was very incoherent due to the accident.
Based on Teston's admission, and blood alcohol reading of .14, Teston was subsequently tried and found guilty of driving while intoxicated.
Notwithstanding this conviction, Teston claimed that Peggy Barrett was driving at the time of the accident, and not himself. In support of this contention, he called Mr. Campbell to testify as to what he saw when he arrived at the scene of the accident.
Mr. Campbell testified as follows concerning the positions of the various parties when he arrived on the scene:
Q. Were there any people around or inside the car?
A. Yes, Sir, there were ... I saw one person which was Mr. White, I found out later, laying ... he was laying outside the car. The back seat ... it was a two-door. He was laying outside the back ... in between the back seat and the front seat facing towards the rear of the car. And Mr. Teston, his whole body was wrapped around... the windshield was wrapped around the whole top part of his body.
Q. Which side of the car was Mr. Teston on?
A. Mr. Teston was on the passenger's side. Well, halfway. I have to say he was in the center, dead center, of the windshield. The windshield was totally... it wasn't even intact in the car at all. It was totally wrapped around his body.
Q. Did you see a female at the scene?
A. Not right at first... And then when Mr. White had moved, the girl slid down a little ways and that's when I saw her. And she was bleeding severely.
...
She was laying half on top of Mr. White and all the way out of the car. She was kind of crumpled on top of him. That's why I didn't notice her at first. And her legs were inside the car and her feet were tangled up underneath the pedals of the driver's side.
Teston contends that Mr. Loupe's testimony stating that Barrett was driving the Teston vehicle around 6:30 p.m., together with Mr. Campbell's testimony concerning the positions of the passengers after the accident is sufficient to find the jury verdict clearly wrong.
The testimony of Officers Constantino and Wisner together with the DWI conviction[1] of the appellant is ample evidence *246 on which to base a verdict of negligence. While there is evidence contrary to that presented by the plaintiff, it is speculative at best. It may be true that Barrett was driving the Teston vehicle at 6:30 that evening, but that was more than three hours prior to the accident. Furthermore, the positions of the passengers after the accident is far from conclusive as to where they were in the vehicle prior to the accident. For these reasons we do not find the jury verdict clearly wrong.
The appellants further contend that the trial judge erred in admitting accident reconstruction testimony from Officers Constantino and Wisner, who were not qualified as expert witnesses in the field of accident reconstruction, although they were accepted by the court as experts in the field of accident investigation.
The following is an excerpt of the offending testimony:
Q. Based upon your investigation and your job training with the investigation that you did in this particular accident involving the death of Peggy Barrett, did you reach an opinion as to where the occupants were in Rodney Teston's car at the time of the wreck?
A. Yes, I did.
Q. And could you tell the jury what your opinion was?
A. My opinion is that Rodney Teston was driving the vehicle, Peggy Barrett was sitting in the front passenger's seat, and that Kenneth White was sitting in the left back seat or directly behind the driver.
Q. On your accident report, you noted where the bodies ended up after the accident. Would you tell the jury how you arrived at that conclusion?
A. From ... just as I had indicated earlier, from interviewing the EMTs and the sheriff's deputies that were on the scene at the time initially.
Q. In your experience and training in investigating accidents of this sort, is it your opinion that it's not unusual for bodies to switch places in an accident involving a car travelling at a high rate of speed?
A. That's correct. I've investigated accidents before where people in the back seat have ended up in the front seat and people in the front seat have ended up in the back seat, people sitting on the right side of the vehicle have been on the left, and vice-versa. So it's not unusual.
Q. Did this car become airborne at any time?
A. Yes, it did.
Q. And could you tell us about how far?
MR. RIDDLE: Again, he's not qualified to tell if it became airborne. He's already testified he wasn't there at the accident, Your Honor.
JUDGE: Well, I'm going to overrule the objection. He's being asked to interpret his report and that's what his report shows and he's given the basis for determining that report. It's been introduced into evidence and I think he's entitled to explain his report. So I'll overrule the objection.
BY MR. FLETCHER:
A. In answer to your question, the vehicle became airborne after striking a mailbox and hitting a ditch embankment and culvert and it went airborne and landed back about 40 feet is what we estimated with our measurements.
Q. Who measured these distances? Could you tell us that?
A. Myself and Sergeant Wisner.
Initially we note that Officer Wisner was never questioned nor did he offer opinion testimony as to how or why Peggy Barrett's body was found on the driver's side of the car. Based on the testimony of Officer Constantino we conclude that the opinions elicited did not require special study in accident reconstruction. Officer Constantino based his opinion, as to where the passengers were located prior to the *247 accident, on the information he obtained during his investigation. His investigation included interviewing the EMTs and Billy Campbell at the scene of the accident, and interviewing Teston, who admitted that he was driving the car, that Peggy was in the passenger seat and that Kenneth White was in the back seat. Indeed the conclusion reached by Officer Constantino as to the position of the passengers was determined in the course of his official duties of accident investigation in preparing an accident report. This opinion, therefore, seems clearly within the purview of accident investigation, and as such was properly admissible.
Appellants assert that Peggy Barrett assumed the risk of the injuries she received in the accident, or was contributorily negligent because she knew or should have known of appellant's condition and nevertheless remained in the vehicle with him.
The law regarding a passenger riding with a driver who has been drinking excessively was set out by the Supreme Court in Prestenbach v. Sentry Ins. Co., 340 So.2d 1331 (La.1976) as follows:
The law is well settled that a guest passenger riding with a driver who has been drinking excessively assumes the risk of injuries received in an accident caused in whole or in part by the driver's negligence, if the alcohol-induced impairment of the driver's ability is a substantial contributory cause of the driver's negligence and if the guest passenger knows or should have known of the driver's condition and nevertheless voluntarily rides with him. Marcotte v. Travelers Ins. Co., 258 La. 989, 249 So.2d 105 (1971); Jones v. Continental Casualty Co., 246 La. 921, 169 So.2d 50 (1964).
As with other affirmative defenses, the defendant who pleads contributory negligence or assumption of the risk bears the burden of proving it. La.C.Civ. P. art. 1005; McInnis v. Firemen's Fund Insurance Company, 322 So.2d 155 (La.1975); Marcotte v. Travelers Ins. Co., cited above. In the present case, this means that, to defeat recovery for damages caused by the driver's undoubted negligence, the defendant must prove by a preponderance of the evidence that: (1) the driver was intoxicated; (2) his intoxication was a cause of the accident; and (3) the plaintiffs' decedent knew or should have known of the driver's condition.
...
As we stated in Langlois v. Allied Chemical Corporation, 258 La. 1067, 249 So.2d 133 (1971), "the determination of whether a plaintiff has assumed a risk is made by subjective inquiry...." See also McInnis v. Firemen's Fund Ins. Co., 322 So.2d 155 (La.1975); Prosser on Torts, pp. 447-450 (4th ed., 1971).
In order for a plaintiff to assume a risk, he must knowingly and voluntarily encounter the risk which causes his injury. McInnis v. Firemen's Fund Ins. Co., cited above. "Knowledge" is the mainstay of this defense, and it must be proved by a preponderance of the evidence.
Teston contends that the fact that Peggy Barrett was in his company for over six hours and witnessed him consume alcohol is sufficient to establish that Peggy knew or should have known of the appellant's condition. This is the same argument asserted by the defendant in Prestenbach, supra, to which the court replied as follows: "[F]or purposes of a knowing assumption of risk, we impute knowledge to a plaintiff, not because he was in a position to make certain observations, but only when he actually makes those observations and, from them, should reasonably have known that a risk was involved." Id. at 1335. In the instant case, the defendant presented no evidence that would indicate that Peggy Barrett had knowledge of the driver's intoxicated condition or that, from her personal observations of the driver's prior activities and condition, she should reasonably have known of this condition.
In summary, we find no error in the jury's conclusion that the defendant failed to prove the defense of assumption of the risk. The record is devoid of any testimony *248 as to how appellant behaved that fateful night. The last person to see the young people was Teston's neighbor, Norbert Loupe, and Mr. Loupe was never questioned as to whether the appellant appeared intoxicated. Furthermore, there is an unexplained gap in time from when the young people left the Teston home between 6:30 and 7:00 p.m., and when the accident occurred at 9:45 p.m. The appellant, Teston, offered no testimony as to what happened during those three hours, except to say he fell asleep. We find that the evidence does not preponderate in favor of proving that Peggy Barrett knew or should have known of appellant's condition. We further find that there is insufficient evidence to establish any contributory negligence on the part of Peggy Barrett. The evidence presented at trial did not establish that Rodney Teston was so obviously intoxicated that a reasonable person who was associated with him would know of his alcohol induced impairment. Accordingly, we find no error in the jury's decision.

QUANTUM
The jury awarded Marty Siemann $250,000 for the loss of love and affection, society, grief and mental anguish of her sixteen-year-old daughter. The appellants contend that this award is excessive. Based on the relationship of the plaintiff and her daughter, we do find the award excessive.
Before an appellate court can disturb a jury's award, the record must reveal an abuse of discretion. Only after finding that the jury has abused its discretion can the appellate court modify the award, and then only to the extent of lowering it to the highest point reasonably within the jury's discretion. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976).
The reviewing court must look first, not to prior awards, but to the individual circumstances of the present case. Reck v. Stevens, 373 So.2d 498 (La.1979). Prior awards may serve as an aid in determining excessiveness only where, on an articulated basis, the present award is shown to be greatly disproportionate to past awards for truly similar injuries. Reck, supra at 501.
The evidence presented at trial established that Peggy Barrett was the youngest child of Marty Siemann and that she lived with Mrs. Siemann and Mrs. Siemann's mother. Mrs. Siemann's testimony established an extremely close and open relationship between her and her daughter. Mrs. Siemann described Peggy as being a ray of sunshine and the center of both her and her mother's lives. She went on to say that Peggy was a beautiful and happy child and that she made her and her mother very happy.
The appellant relies on Anthony v. Hospital Service Dist. No. 1, 477 So.2d 1180 (La.App. 1st Cir.1985), writ denied, 480 So.2d 743 (La.1986), in arguing for reduction of the jury award to Mrs. Siemann to $75,000. In Anthony this court reduced an award of $175,000 to $75,000 for each parent for the loss of their three-year-old son. The court concluded that the parents had a normal relationship with their son and that all the cases it examined wherein plaintiff received in excess of $100,000 for the loss of one child contained abundant testimony of an unusually close or unique relationship between the child and his parent. In some cases, the parent relied on the child for emotional and/or financial support. Id. at 1186.
We find that Mrs. Siemann and her daughter had an unusually close and unique relationship. We also find that Mrs. Siemann, being a widow, relied on Peggy for emotional support. Therefore we find the Anthony case distinguishable on its facts.
We elect instead to be guided by those cases where the parent/child relationship was close and unique as in the instant case.
A review of recent jurisprudence reveals that the courts of this state have been unwilling to award a parent in a wrongful death action more than $150,000. Moreover, the awards approaching the $150,000 level have been to parents who were either single or to a parent who suffered mental or physical injury caused by their child's death. Lang v. Prince, 447 So.2d 1112 (La.App. 1st Cir.1984), writ denied, 450 *249 So.2d 1309 (La.1984), and 450 So.2d 1311 (La.1984) (award of $150,000 to mother who suffered extreme mental and physical illness due to son's death); Pawlak v. Brown, 430 So.2d 1346 (La.App. 3d Cir. 1983), writ denied, 439 So.2d 1072 (La. 1983) (award of $125,000 to each parent who had close relationship with son and suffered extreme grief upon his death); Johnson v. Folse, 438 So.2d 1137 (La.App. 1st Cir.1983) (award of $145,000 to widowed mother for loss of daughter); Williams v. City of New Orleans, 433 So. 2d 1129 (La.App. 4th Cir.1983), writ denied, 437 So.2d 1135 (La.1983) (award of $150,000 to widowed mother for loss of son where she acted as father and mother to son from an early age and the relationship was described as very close); Johnson v. Georgia Cas. & Sur. Co., 488 So.2d 1306 (La.App. 3d Cir.1986), writ denied, 493 So. 2d 1223 (La.1986) and 493 So.2d 1224 (La. 1986) ($300,000 award to each parent reduced to $125,000 each, based on a normal family relationship between parents and adopted son); Acy v. Aetna Cas. & Sur. Co, 499 So.2d 262 (La.App. 1st Cir.1986), writ denied, 503 So.2d 16 (La.1987) ($350,000 award to widowed mother who shared a close relationship with her deceased son was reduced to $150,000).
After a careful review of the record and recent cases of a similar nature, we conclude that the trier of fact abused its "much discretion" in making an excessive award of damages to Marty Siemann for her loss of love and affection, society, grief and mental anguish. We believe that $150,000 is the highest amount reasonably within the discretion of the trial court in the present case. Hence, pursuant to Reck at 501, we reduce the award to Marty Siemann to $150,000.
The jury also awarded Marty Siemann $25,000 for Peggy's pain and suffering prior to her death.
The appellant contends that the jury erred in awarding damages for conscious pain and suffering of the decedent because no such damages were proven.
The law provides that the trier of fact is within its much discretion in awarding damages for pain and suffering where there is the smallest amount of evidence of pain on the part of deceased by his actions or otherwise. Marceleno v. State, Department of Highways, 367 So.2d 882 (La.App. 2d Cir.1978), writ denied, 369 So.2d 1364 (La. 1979), cited by Anthony, supra at 1185. However, where there is no indication that the decedent consciously suffered any pre-death pain, an award cannot be made to the survivors for pain and suffering. Blanchard v. Rodrigue, 340 So.2d 1001 (La.App. 1st Cir.1986), writ denied, 341 So.2d 1130 (La.1977); Daniels v. Conn, 382 So.2d 945 (La.1980); Malmay v. Sizemore, 474 So.2d 1358 (La.App. 2d Cir.1985), affirmed on other grounds, 493 So.2d 620 (La.1986). In the above cited cases there was no evidence that the decedents ever regained consciousness following their accidents and therefore, they experienced no conscious pain and suffering for which an award could be made.
Our review of the record reveals that Peggy Barrett never regained consciousness following the accident and lived only five to ten minutes thereafter. Billy Campbell testified that he felt Peggy's pulse when he arrived at the scene of the accident. However, there was no testimony that Peggy was conscious or made any sounds or movements indicating any conscious pain or suffering prior to her death. Therefore, we find the jury's award of $25,000 for pain and suffering in error.
Finally, the appellant asserts that the trial judge erred in not allowing defense counsel to question the defendant as to the availability of alcohol to the decedent at plaintiff's home prior to the decedent's departure with the defendant. The trial court sustained the objection to this testimony because the availability of alcohol at the decedent's home had already been established through Mrs. Siemann's testimony and the judge found the question to be irrelevant. We find no error in the trial court's ruling
For the foregoing reasons the judgment of the trial court awarding $250,000 to plaintiff is reduced to $150,000. The judgment of the trial court awarding $25,000 *250 for the pain and suffering of Peggy Barrett prior to her death is reversed. In all other respects the judgment of the trial court is affirmed. Costs of this appeal are assessed against appellants.
AMENDED, REVERSED IN PART AND AFFIRMED IN PART.
NOTES
[*] Judge Remy Chiasson, retired, has been assigned temporarily to this Court by the Supreme Court of Louisiana, to fill the vacancy created by the death of Judge John S. Covington.
[1] LSA-R.S. 13:3739 reads as follows:

A person claiming damages for injury to person or property, or for wrongful death, in a civil action may introduce evidence that a party alleged to have caused the damages was convicted, either after a trial or upon a plea of guilty, but not upon a plea of nolo contendere, of a crime punishable by death or imprisonment and arising out of the factual circumstances in which the party is alleged to have caused the damages.
Proof of the conviction in the civil action shall create a rebuttable presumption that the party in fact committed those acts essential to the commission of the crime. A judgment of conviction shall not be admissible during pendency of an appeal to a Louisiana appellate court.